Raymond J. DONOVAN, Plaintiff,

v.

Edward J. CARLOUGH, et al., Defendants.

Civ. A. No. 81–1988.

United States District Court, District of Columbia.

Nov. 17, 1983.

Marc I. Machiz, Stephen J. Kessler, Plan Benefits Security Div., U.S. Dept. of Labor, Washington, D.C., for plaintiff.

Michael D. Lowe, Harry Huge, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This case is before the Court upon cross-motions for summary judgment by the parties. The Court heard oral argument. It has considered the pleadings, exhibits and affidavits, together with the extensive and ably-crafted briefs of the parties. It appears to the Court that there is no genuine issue as to any material fact and that the plaintiff is entitled as a matter of law to summary judgment in accordance with the following opinion.

## I. BACKGROUND

The National Stabilization Agreement of the Sheet Metal Industry Trust Fund ("SASMI" or "the Fund") is an employee welfare benefit plan under Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1), and was created pursuant to Section 302(c)(5) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 186(c)(5). A board of six trustees ("the Trustees") operates the Fund and interprets SASMI Rules and Regulations. SASMI is intended to minimize adverse economic effects from major fluctuations of employment in the industry on individual sheet metal workers and to preserve for the industry a pool of experienced and skilled sheet metal workers. To this end, SASMI provides qualified and eligible sheet metal workers with the "Basic Underemployment Benefit" and "Special Incentive Benefit" programs. SASMI Rules and Regulations provide that the Basic Underemployment Benefit is payable to an eligible and qualified participant at the conclusion of a six-month "Stabilization Period," if during that period the participant was involuntarily unemployed and consequently worked fewer than a certain number of hours specified in SASMI Rules and Regulations. There are two Stabilization Periods in each year: from January 1 to June 30 ("Stabilization Period 19XXA"), and from July 1 to December 31 ("Stabilization Period 19XXB"). The Special Incentive Benefit is available to participants who have received less than a certain amount of Underemployment and other benefits from SASMI during four consecutive Stabilization Periods.

The SASMI Rules and Regulations also provide that applications for Underemployment and Special Incentive Benefits must be filed within ninety days after the end of the Stabilization Period, and that as soon as practicable the Trustees of the Fund shall arrange for payments of benefits to which

an employee is entitled. The Rules and Regulations also provide that benefits otherwise payable to a participant may be forfeited under certain conditions. The particular forfeiture provision which is the heart of this litigation states: "Benefits shall be forfeited under the following conditions: ... (g) any employee who no longer is working under a Contract." The term "contract" is defined in the Plan's rules as "a collective bargaining agreement in effect between a local union ... and an employer requiring the employer to make contributions to [the Plan]." The purpose of the forfeiture provision is to protect the actuarial and financial soundness of the SASMI Trust Fund by preventing manipulation of contributions and benefits by participants. When the forfeiture provision was instituted, the Trustees were hoping to prevent local unions and contractors from timing their entry and exits from SASMI in a manner which allowed participants to receive more benefits than they paid in contributions. Because contributions are directly related and benefits are inversely related to the number of employee hours worked, employers and unions might try to enter the SASMI when employment was low (contributions low; benefits high) and leave the Fund when employment was high (contributions high, benefits low). The rule in question manifests the Trustees' attempt to protect SASMI against the long-term effects of such behavior. The complaint alleges that defendant Trustees breached their fiduciary duties to qualified and eligible participants of SASMI by failing to pay benefits to the participants as a result of the Trustees' unreasonable interpretation of that forfeiture provision, in violation of ERISA § 404(a)(1)(A), (B), and (D), 29 U.S.C. § 1104(a)(1) (a)(2)(A), (B), and (D).[1] The Trustees argue that their interpretation and application of the Rules and Regulations was reasonable based upon the facts before them.

The Sheet Metal Workers International Association Local No. 16 ("Local 16") is located in Portland, Oregon. Members of the collective bargaining unit represented by Local 16 ("the Local 16 participants") worked pursuant to a collective bargaining agreement originally effective from April 1, 1976 through March 31, 1979. Employers of the Local 16 participants made contributions to SASMI without interruption from April 1, 1976 through March 31, 1979.

On November 1, 1978, the Local 16 membership decided that it would not seek, in its new collective bargaining agreement to become effective April 1, 1979, a provision requiring the employers to make contributions to SASMI. During November 1978, the Trustees were unofficially informed of Local 16's decision. On November 30, 1978, counsel for Local 16 sent to Trustee Carlough a copy of an agreement between the employers and Local 16 which, effective January 1, 1979, deleted that provision of the collective bargaining agreement which required the employers to make contributions to SASMI. The agreement also provided that it "was conditioned upon approval by the SASMI Board of Trustees," and contained places for the Trustees' signatures. By letter of December 20, 1978, Edward J. Carlough, in his capacity as Chairman of the SASMI Board of Trustees, informed Donald S. Richardson as follows:

> ... [I]f the action taken [on November 1, 1978] by one-fifth of the members of Local 16 is indeed the official action of the Local, then no further SASMI benefits will be available to any member of Local Union 16 after December 31, 1978. This means *all* benefits, including any Underemployment and Special Incentive Benefits to which a beneficiary has been entitled in the Spring of 1979, had SASMI remained in the Contract. The same results would be obtained if the contrac-

---

**1.** ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide that a plan fiduciary must discharge all duties solely in the interest of the participants, for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the plan, and with the care, skill, prudence, and diligence which a prudent person would use. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), further provides that a plan fiduciary must discharge all duties in accordance with the documents governing the plan.

tual obligation to contribute the SASMI was voted out, now or effective March 31, 1979."

On March 17, 1979, representatives of SAS-MI told Local 16 participants that any benefits which otherwise would have been payable to them at the conclusion of the 1978–B Stabilization Period became forfeit under Article VI, Section 1(g) of the 1977 Rules as a result of the vote on November 1, 1978 but that the forfeiture could be voided if the membership rescinded its earlier action to withdraw provisions for SAS-MI from its current collective bargaining agreement and to maintain provisions requiring contributions to SASMI in the next collective bargaining agreement. The membership of Local 16 voted not to include, in the collective bargaining agreement to commence April 1, 1979, an obligation on the employers to make contributions to SASMI.

Between January 1 and March 31, 1979, the employers made all contributions due under the 1976 collective bargaining agreement (assuming the Amendment Agreement was not effective to change the agreement). Additionally, some Local 16 participants filed applications with SASMI for Underemployment and Special Benefits for Stabilization Period 1978–B. SASMI denied all applications and all appeals on the ground that the participants forfeited their right to benefits because they were "no longer working under a Contract."

## II. STANDARD OF REVIEW

The Secretary admits that most cases reviewing trustee action under Section 404 of ERISA have concluded that the proper standard of review is whether the trustees have acted arbitrarily, capriciously, or in bad faith. However, the Secretary argues that because the Court is reviewing a trustee interpretation of a welfare plan, as opposed to other trustee action, it should set aside such interpretation which is contrary to the "plain meaning" of the plan. The Court finds no validity in the Secretary's argument.

This circuit has for over two decades applied the "arbitrary or capricious" standard of review to trustees' decisions. *Maggard v. O'Connell,* 671 F.2d 568 (D.C.Cir. 1982); *Pete v. United Mine Workers of Am. Welfare Retirement Fund,* 517 F.2d 1275 (D.C.Cir.1975) (en banc); *Roark v. Boyle,* 439 F.2d 497, 499 (D.C.Cir.1970); *Gaydosh v. Lewis,* 410 F.2d 262, 265 (D.C. Cir.1969); *Roark v. Lewis,* 401 F.2d 425, 426–27 (D.C.Cir.1968); *Kosty v. Lewis,* 319 F.2d 744, 747 (D.C.Cir.1963), *cert. denied,* 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964); *Danti v. Lewis,* 312 F.2d 345, 348 (D.C.Cir.1962). In *Danti v. Lewis,* 312 F.2d 345 (D.C.Cir.1962), the court said judicial review is proper to determine "whether the Trustees have acted arbitrarily, capriciously or in bad faith; that is, is the decision of the Trustees supported by substantial evidence or have they made an erroneous decision on a question of law." *Id.* at 340. Contrary to plaintiff's argument, *Danti* does not in any way suggest that a standard other than "arbitrary and capricious" is applied to trustee interpretations. Moreover, in *Maggard v. O'Connell,* 671 F.2d 568 (D.C.Cir.1982), the court reaffirmed the *Danti* standard of review, adding that such review must be conducted with a "stern hand and flinty eye," keeping in mind that the Trustees have a duty to preserve the corpus of the trust and are not inclined to make awards from it. *Maggard,* however, said nothing to imply that the standard of review is "plain meaning," rather than arbitrary and capricious, when the court is reviewing trustee interpretations of plan provisions.

In *Dennard v. Richards Group, Inc.,* 681 F.2d 306 (5th Cir.1982), the Fifth Circuit Court of Appeals addressed the argument plaintiff makes here and held that a trustee's interpretation of a plan provision, contrary to its plain meaning, is not sufficient grounds, in and of itself, to support reversal of the trustees' action. Instead, the court held that the trustees' incorrect interpretation of a provision is only one factor considered in deciding whether the action was arbitrary and capricious:

Where, as here, one party is arguing that the Plan's provisions are not ambiguous and that the ... [Trustees have] applied the provisions of the Plan in direct contravention to its terms the District Court should ... [first determine] the correct interpretation of the Plan. From that finding, the court should ... [proceed] to determine if the ... [Trustees], even if incorrect in ... [their] determination, acted arbitrarily and capriciously as that term has been used in other ERISA cases.

*Id.* at 308.

 Accordingly, this Court holds that the proper standard of review in this case is whether the trustees acted arbitrarily, capriciously, or in bad faith.[2] That is, is the decision of the trustees supported by substantial evidence or have they made an erroneous decision on a question of law. *Danti,* 312 F.2d at 348. The Court also holds that whether the Trustees' interpretation of the plan is legally correct is one factor to consider in the review for arbitrary and capricious action. *Dennard,* 681 F.2d at 308. The weight which the Court attaches to that factor necessarily will vary according to the degree of support for the Trustees' interpretation which can be found in the plan provisions. *See Dennard,* 681 F.2d at 314.

## III. APPLICATION OF THE ARBITRARY AND CAPRICIOUS STANDARD

 Courts, in applying the arbitrary and capricious standard, consider a wide variety of factors to determine whether the Trustees acted properly. The standard of review " 'defies generalized application' and must be contextually tailored." *Maggard,* 671 F.2d 568, 571. In this case the Court shall consider: (1) whether the Trustees' interpretation is contrary to the language of the provision in question or renders provisions of the plan superfluous; (2) whether it is consistent with plan's purposes; (3) whether it is consistent with the provision's purpose; (4) whether it is consistent with prior similar interpretation and whether the participants had notice of the Trustees' interpretation.

### 1. *Interpretation is contrary to language of provision and renders the term "contract" superfluous.*

The forfeiture rule, read in conjunction with the term "contract," provides: "Benefits shall be forfeited under the following conditions: Any employee who is no longer working under a collective bargaining agreement in effect ... requiring the employer to make contributions to the National SASMI...." As best the Court can determine, the Trustees interpret the forfeiture rule to mean that eligibility is forfeited either when the local union makes a binding decision to delete the employers' obligation to make SASMI contributions from the collective bargaining agreement or when the local union officially *notifies* the Trustees that such a binding decision has been made.[3] Goodhue Declaration

---

**2.** Neither *Morgan v. Mullins,* 643 F.2d 1320 (8th Cir.1981) nor *Snyder v. Titus,* 513 F.Supp. 926 (E.D.Va.1981), also relied upon by plaintiff, supports its "plain meaning" theory; each applies the arbitrary and capricious standard.

**3.** The Trustees' brief in support of its cross motion for summary judgment never clearly defines the Trustees' interpretation of the rule. Three of the four declarations of the Trustees interpret the rule as stated in the text. Admittedly, some actions of the Trustees are consistent with another interpretation of the rule which would probably not be contrary to the language of the rule. For example, in their December 20, 1978 letter the Trustees tell Local 16 that benefits are forfeited as of December 31, 1978. Since the Trustees received official notification of the withdrawal on November 30, 1978, this letter could be read to imply that the Trustees interpreted the rule to mean that benefits are forfeited on the day that the employers' obligation to make contribution ceases, rather than on the date of notification of a decision. However, the December 31, 1978 forfeiture date can also be explained in a manner consistent with the Trustees' declarations. Benefits "accrued" during stabilization period 1978–B are not payable until after December 31, 1978. Therefore, even though the Trustees declare forfeiture effective as of November 30, 1978, the benefits which are forfeited could not have been applied for nor paid until after December 31, 1978. Accordingly, the Trustees' letter indicat-

¶ 13; Loehr Declaration ¶¶ 9, 11 & 13; Martina Declaration ¶ 7. *But see* Silva Declaration ¶ 9. It is crucial to note that the forfeiture date under this interpretation is not the date that the contributions actually cease to be made, nor the date that the contractual obligation to make contributions expires. Rather, it is the date that the local union decides, or notifies SASMI that it has decided that presently, or at some future date, its collective bargaining agreement will not require the employers to make contributions. This interpretation cannot be supported by a literal reading of the forfeiture provision, as it clearly focuses upon the date that the obligation to make contributions ceases and not on the day that the Trustees are notified of a decision to end the obligation at some future date. The Trustees' interpretation simply reads the definition of the term "contract" out of the Rules and Regulations.

The Court does not mean to imply that there is only one proper interpretation of the forfeiture provision or that such interpretation must be a literal one. There is no doubt, for example, that the forfeiture provision could be interpreted in a manner that would be significantly affected by the existence and dates of the stabilization periods and benefit application periods. The existence of other provisions of the plan might cause the Trustees to reasonably interpret the forfeiture rule in a manner inconsistent with its literal meaning, but consistent with the entire plan when viewed in context. In this case, any reading of the forfeiture rule, in conjunction with the term "contract," clearly requires one to conclude that the date of benefit forfeiture is closely related to the date that the contractual obligation to make contributions ends. The precise manner in which that relationship is defined may properly be

ing that benefits are not payable after December 31, 1978 is not inconsistent with a November 1 or November 30, 1978 forfeiture. Because the Trustees' declarations clearly focus upon the date of a binding decision to delete the employers' obligation to contribute or upon the date of

subject to varying permissible interpretations, but nothing in the forfeiture rule or the Rules and Regulations even remotely implies that the date the union tells the Trustees of its decision to end the contractual obligation at a future date affects the date that benefits are forfeited. Additionally, there is no rational relationship between the date of decision to end the contractual obligation or the date of notification of such a decision, and the date that the contractual obligation actually terminates. After all, one local union might notify SASMI that two years hence its employers will no longer be obligated to make contributions, while another local union might notify SASMI that two days hence its employers' contractual obligation will terminate. The interpretation is contrary to the literal definition of the term "contract" in the Plan and this contrary interpretation is not the result of any rational relationship between the term and the interpretation. Under such circumstances the Court must conclude that the Trustees' interpretation is contrary to the meaning of the language of the Plan and renders the term "contract" superfluous.

### 2. *Consistency With Plan Purposes*

The two purposes of the Plan are to minimize the adverse economic effects of major fluctuations in construction employment, and to preserve for the industry a pool of experienced and skilled employees. Trustees argue that by "denying eligibility to Local 16 once it has decided to no longer participate ... [in the] program, the Trustees acted to preserve the Fund's financial resources for the remaining participants...." While the Trustees are undoubtedly correct, the Court attaches very little weight to their argument. Every time the Trustees make a decision to deny benefit applications, they are preserving

official notification of that decision as the date of forfeiture, and because the Trustees' actions are not inconsistent with that declared interpretation, the Court considers that interpretation as before it for review.

the Fund's financial resources. Were the Court to defer to this argument, Trustee denials of benefits could never be deemed to be arbitrary and capricious.

### 3. Consistency With Forfeiture Rule Purposes

The purpose of the forfeiture rule is to prevent local unions from playing the construction industry's employment cycle against SASMI's long-term financial soundness by entering SASMI during periods of low employment and leaving when employment is high. The rule, as interpreted by the Trustees, does undoubtedly serve this purpose to some extent. However, as noted earlier, there is no predictable relationship between the date on which the local union decides to leave SASMI or the date on which it officially notifies SASMI of its decision to leave, and the date on which it actually leaves. Moreover, once the Trustees' interpretation of the rule became widely known, it could easily be circumvented by local unions. Local unions, knowing that the date on which they decide to withdraw or notify the Trustees of that decision will trigger forfeiture, will simply postpone the decision or notification until the latest possible time. Under such circumstances the date of forfeiture is not tied to contributions but to a date selected by the union. The precise impact of the forfeiture rule would thus depend upon the degree to which a local union is willing to attempt to manipulate the forfeiture rule. This is exactly the type of self-serving participant manipulation that the forfeiture rule was intended to prevent.

### 4. Prior Consistent Interpretations

The Trustees argue that their application of the forfeiture provision to the withdrawal of Local Union 59, Local Union 20, Local Union 196 and Local Union 359 is consistent with the interpretation and application here. Without reviewing the facts of each case, it is sufficient to note that in none of those cases were the Trustees specifically required to apply their interpretation that either the date of the decision to end the contractual obligation or the date of official notification of that decision was crucial. Each of those cases is explainable merely by reference to the date on which the obligation to make contributions actually ceased. The Trustees provide no documentary evidence which indicates that any Local Union was ever previously notified that the date of the decision or date of notification of such decision affected application of the forfeiture rule.[4]

Upon consideration of all the relevant factors, the Court concludes that the Trustees' interpretation and application of the forfeiture rule must be reversed as arbitrary and capricious. Plaintiff's motion for summary judgment will be granted. Defendant's cross-motion for summary judgment will be denied.

Counsel for plaintiff shall submit an appropriate order in accordance with the foregoing opinion after consultation with defendants' counsel.

---

**4.** The Court also considered other factors highlighted by the Trustees. First, the Court is aware that the Trustees gave Local Union 16 notice that if it did not rescind its vote to leave SASMI, benefits would be terminated effective December 31, 1978. Second, the Court concludes that the Amending Agreement was not a legally binding modification of the collective bargaining agreement effective December 1, 1978. The Trustees' approval of the Amending Agreement was a condition precedent to the effectiveness of that agreement and that condition was not excused. The condition was a material part of the Amending Agreement and non-occurrence of the condition did not cause a forfeiture to Local 16's participants.