George STEWART, et al., Appellants,

v.

NATIONAL SHOPMEN PENSION FUND, et al.

No. 85–5869.

United States Court of Appeals, District of Columbia Circuit.

Argued April 21, 1986.

Decided July 25, 1986.

---

Gill Deford, with whom Neal Dudovitz, Los Angeles, Cal., and Burton D. Fretz were on brief, for appellants.

Thomas J. Hart, with whom Lena S. Zezulin, Washington, D.C., was on brief, for appellees.

Before SCALIA and SILBERMAN, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by SILBERMAN, Circuit Judge.

SILBERMAN, Circuit Judge:

In this suit, appellant employees and retirees challenge their pension fund's decision to cancel service credits they received for employment before their employers joined the fund. Because service credits are a basic factor in determining benefit levels, the cancellation resulted or will result in reductions in the appellants' pensions. The cancellation came in response to the appellants' employers' withdrawal from the fund before contributing enough money to cover the appellants' years of employment prior to enrollment in the fund. The district court granted summary judgment in favor of the pension fund and its trustees, holding that the decision to cancel the credits was not arbitrary and capricious since it served to avoid unfunded pension liability. Appellants argue that the pension fund was obliged to make each cancellation decision in light of a reexamination of the overall "actuarial soundness of the fund" at the time of decision. Because we believe that the trustees' reliance on a general rule designed to preserve the fund's long-term financial stability was reasonable, however, we affirm the district court's decision.

Appellee National Shopmen Pension Fund is a multi-employer pension plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002(37)(A) (1982), with over 300 contributing employers and nearly 18,000 participants. Appellants George Stewart and Lee Roy Warren, representatives of a class of some 368 employees and retirees, are contesting one facet of the Fund's method of calculating pension benefits: its treatment of the years a worker has spent with an employer before the employer joined the Fund. Under the terms of the Fund's governing plan, when an employer begins making payments to the Fund, its employees' pension benefits are calculated on the basis of all their years of service with the contributing employer, not merely the years of service after enrollment. Because granting past service credits creates unfunded liabilities, however, the Fund assesses contributions from the enrolling employer that exceed the amount necessary to cover its employees' post-enrollment service alone. This surplus is used to amortize the unfunded past service liability. But an employer withdrawing from the Fund after a short time may not have contributed enough to fund the past service liability incurred on its behalf. To protect the Fund against the withdrawing employer's "dumping" of unfunded liability, Section 2.09 of the Fund's rules permit it to cancel any or all of the past service credits of present and former employees of the withdrawing employer.[1]

In each of the thirty-seven instances in which employers have withdrawn from the Fund since the adoption of Section 2.09 in 1976, the Fund has directed Martin Segal Co., its actuary and consultant, to prepare an analysis of the effect of the withdrawal on the Fund. Each actuarial report calculated both the amount of Fund assets attributable to the withdrawing employer's contributions and the amount of the Fund's pension liability to the withdrawing employer's workers and retirees. Where the report indicated that attributable assets

---

1. Section 2.09 provides:

    If an Employer's participation in the Fund with respect to a bargaining unit or group terminates, the Trustees are empowered to cancel any obligation of the Trust Fund that is maintained under the Trust Agreement with respect to that part of any pension for which a person was made eligible on the basis of employment in such bargaining unit or group prior to the Contribution Period with respect to that unit or group. Neither shall the Trustees, Employers, nor the Union be obligated to make such payments.

Such arrangements are permissible by virtue of a provision of ERISA, 29 U.S.C. § 1053(a)(3)(E) (1982). Partial or complete cancellation of past service credits pursuant to Section 2.09 reduces the amount of accrued benefits which employees and retirees receive. Since 1982 this section has not been used by the Fund to affect the vesting of rights to a pension, as a result of an adverse judicial decision. *See Fentron Indus. v. National Shopmen Pension Fund,* 674 F.2d 1300 (9th Cir.1982). *See generally Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552, 1556–57 (D.C.Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984).

were exceeded by liability, resulting in the dumping of unfunded benefit liabilities on the Fund—which occurred in twenty-three of the thirty-seven employer withdrawals—the Trustees invariably directed that past service credits of the withdrawing employer's workforce be cancelled to the extent necessary to eliminate the unfunded liability. Credits of active employees were always cancelled before credits of retirees.

Appellants' employer, Anchor Post Building Products, Inc., withdrew from the Fund in 1979, when it closed its Baltimore facility and permanently laid off its employees there. Under Anchor Post's collective bargaining agreements, the plant closing terminated its obligation to make contributions to, or participate in, the Fund. When Anchor Post withdrew, the Fund received an actuarial analysis from Martin Segal showing that at termination Anchor Post's allocated share of Fund assets was approximately $300,000 and its vested liabilities were $1,050,000, leaving some $750,000 of unfunded liability dumped on the Fund. This sum represented approximately 1.8% of the Fund's total assets at the time of Anchor Post's withdrawal. Even cancellation of all past service credits of Anchor Post's workers and retirees would still leave nearly $155,000 in unfunded liabilities that the Fund would be required to absorb. Based on these calculations, in March 1980 the Trustees voted to cancel all past service credits of Anchor Post's workers and retirees for purposes of determining benefit amounts. Though no recipient was completely deprived of a pension, the effect on the appellants was considerable. George Stewart, then a 74-year-old retiree, saw his pension reduced from $80 to $9 per month. Lee Roy Warren, a 58-year-old who took early retirement, saw his expected benefits drop from $89 to $45 per month.

After an unsuccessful appeal to the Trustees, Stewart and Warren brought a class action in district court seeking declaratory and injunctive relief on the grounds that the cancellation violated specific procedural requirements of ERISA and, in the alternative, that the Trustees acted arbitrarily and capriciously in cancelling the credits. The district court granted appellants' motion for summary judgment on the former grounds, declining to reach the claim of arbitrary and capricious action. *Stewart v. National Shopmen Pension Fund,* 563 F.Supp. 773 (D.D.C.1983). This Court reversed the district court's rulings on the procedural claims and remanded for consideration of the arbitrary and capricious claim. *Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552, 1565–66 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984). In that context, we noted that "avoiding the dumping of unfunded liability is a permissible goal of multiemployer pension funds," because "[w]hen a fund is obligated to pay out more money than it has been paid in, and it is unable to recoup the difference, '[t]hese excess benefits would have to come largely from the stepped-up contributions of current participants.'" *Id.* at 1566 (citation omitted). As a result, we concluded that:

> to the extent that cancellation is necessary to avoid the dumping of substantial unfunded liability, it is presumptively reasonable. On remand, the district court should evaluate the evidence to determine whether there was a reasonable actuarial basis for the action of the trustees.

*Id.* (footnote omitted).

On remand the district court dismissed the suit. The court held that its sole task was to determine whether the Fund's cancellation of past service credits was actually necessary to prevent the dumping of unfunded liability on the Fund; that appellants initially had the burden of showing that "any particular implementation" by the Trustees of the presumptively lawful practice of past service cancellation was arbitrary and capricious, and that appellants had failed to present any evidence to that effect; and that in any event each cancellation of past service credits had a reasonable actuarial basis, because (a) each cancellation was supported by an actuarial study showing that it was necessary to prevent the dumping of unfunded liability

on the Fund, and (b) credits were only cancelled to the extent necessary to cure the dumping. *Stewart v. National Shopmen Pension Fund,* No. 82–3055 (July 26, 1985). This appeal followed.

■■ Trustees of pension funds have fiduciary duties to participants and beneficiaries by virtue of Section 302(c)(5) of the Labor-Management Relations Act, 29 U.S.C. § 186(c)(5) (1982), and Section 404(a) of ERISA, 29 U.S.C. § 1104(a) (1982). These provisions impose on fund trustees the obligation to take no action which is "arbitrary and capricious in light of all the circumstances involved." *Norton v. I.A.M. Nat'l Pension Fund,* 553 F.2d 1352, 1356 (D.C.Cir.1977); *Elser v. I.A.M. Nat'l Pension Fund,* 684 F.2d 648, 654 (9th Cir. 1982), *cert. denied,* 464 U.S. 813, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983). Judicial review of trustees' actions under this standard, like review under the analogous standard in public administrative law, is strictly limited, taking into account the expertise of professionals operating in a complex field. Courts will substitute their judgment for that of trustees only if the trustees' actions are not grounded on any reasonable basis. Choices between reasonable alternatives, it follows, are for the trustees, not the courts. *See Roark v. Lewis,* 401 F.2d 425, 429 (D.C.Cir.1968); *see also Music v. Western Conf. of Teamsters Pension Trust Fund,* 712 F.2d 413, 418 (9th Cir.1983).

■ Appellants argue that this Court, by remanding to the district court to determine whether the Trustees' action had a "reasonable actuarial basis," obliged the Fund to prove that cancelling past service credits *in this instance* was necessary to protect the "actuarial soundness" of the Fund. That position both misreads our prior opinion and misapplies our standard of review. By concluding that cancellation of past service credits to avoid dumping of unfunded liability is presumptively reasonable, this Court necessarily concluded that such a rule (or, in this case, a practice authorized by a rule) serves ultimately to protect a fund's actuarial soundness: "When a fund is obligated to pay out more

money than has been paid in, and it is unable to recoup the difference, '[t]hese excess benefits would have to come largely from the stepped-up contributions of current participants.'" 730 F.2d at 1566 (citation omitted).

Forcing the Fund to prove that such a practice is actually "necessary" to preserve its actuarial soundness, as opposed to merely conducive to that purpose, would impose a virtually impossible burden of proof on the Fund. This is particularly so because the actuarial soundness of a fund is a concept that—unlike a balance sheet—does not refer to a static picture. Rather, it is an estimate of that fund's future prospects based on a number of assumptions which, although made by professionals, are hardly exact. It may well be that, strictly speaking, *no* one rule or practice is indispensable to a fund's actuarial soundness. In any event, the judiciary is neither competent to make such evaluations nor authorized to review a trustee's actions under a test that exceeds the arbitrary and capricious standard. The appellant, in effect, would have this Court abjure our limited standard of review in favor of a test more nearly resembling strict scrutiny. Our cases do not permit such a departure. In short, having held that the Fund's policy of cancelling past service to avoid dumping of unfunded liability is presumptively reasonable, this Court has already implicitly rejected appellants' motion that the Fund is obliged to satisfy a court's independent assessment that the policy is strictly necessary to preserve actuarial soundness.

■ It follows that the Fund is not obliged to show that its policy's application *to these facts* is justified by the need to protect the actuarial soundness of the Fund. Appellants argue essentially that the Fund should be obliged to prove that it could not "afford" to credit their past service—regardless of the reasonableness of its policy in general and of its uniform application of that policy in the past. To state this argument is to reveal its fundamental weakness: no pension fund could operate pursuant to that kind of *ad hoc*

—and inevitably inequitable—decision-making. A trustee's fiduciary duty, after all, extends to *all* a fund's participants. And failure to abide by the past service disregard rule here would amount to granting the appellants a preference not accorded to others. In truth, to accept appellants' argument would be to turn our standard of review on its head and *require* the Fund to act capriciously.

■ Of course we would have an entirely different case if appellants had shown that the Fund's policy was inconsistently applied. We reject appellants' contention that there was inconsistency in the Fund's practice of refusing to *raise* benefits for employees whose withdrawing employers leave the Fund with surplus contributions. Surpluses of this kind are needed to defray dumped unfunded liabilities (as in this case) which exceed cancellable past service credits.

The district court on remand properly read this Court's prior opinion to limit its inquiry to the question of whether the past service credit cancellation was necessary in order to avoid dumping of unfunded liability. It was in that sense—indeed, in light of the logic of this Court's opinion it could only be in that sense—that this Court referred to a "reasonable actuarial basis." 730 F.2d at 1566.[2] Indeed, it was the Fund's failure to produce evidence that such dumping would result that was the key to *Elser v. I.A.M. Nat'l Pension Fund,* 684 F.2d 648 (9th Cir.1982), *cert. denied,* 464 U.S. 813, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983), upon which appellants rely and which this Court itself cited in its previous opinion. Since in this case the Fund's evidence of dumping is undisputed, that is the end of the matter.[3]

The judgment of the district court is therefore

*Affirmed.*

---

2. This Court did say that cancellation is presumptively reasonable to avoid dumping of "substantial" unfunded liability. The Court's reference to "substantial" liability could be read to imply that an insubstantial dumping would not justify cancellation of past service credits. But we read the reference as descriptive of the facts of this case rather than as stating a limiting rule: that is to say, $750,000 (the amount of unfunded liability that would be dumped if past service credits were not cancelled here) is undoubtedly "substantial." Furthermore, because past service credits are cancelled by the Fund only to the extent necessary to avoid dumping unfunded liability, if the unfunded liability avoided were less than in this case, the impact on beneficiaries would consequently be less also.

*Central Tool Co. v. I.A.M. Nat'l Pension Fund,* 523 F.Supp. 812 (D.D.C.1981), *appeals pending,* Nos. 81–2047, –2056 (D.C.Cir.), on which appellants rely, is not inconsistent with our decision here. In that case, the court held that while cancellation of past service credits for purposes of *vesting* was impermissible, cancellation of such credits for purposes of determining benefit levels was appropriate where unfunded liability would otherwise result.

3. Appellants also briefly argue that retirees' vested pension rights may not be altered without their consent, claiming that it is a *per se* breach of contract under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185 (1982), to alter the benefits of one who has already retired and can do little to protect his or her position. This claim was not asserted in the Complaint filed below nor otherwise raised in the district court. It would be inappropriate for us to consider this question in these circumstances. *See District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084 (D.C.Cir.1984).